## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

**RITA C. SEGER,**

        **Plaintiff,**

                    **CASE NO.  3:04-cv-16/RV/MD**

**vs.**

**RELIASTAR LIFE,**
**a.k.a. ING Employee Benefits**

        **Defendant,**

_____/

## ORDER

Pending is defendant's motion for summary judgement.

Plaintiff Rita C. Seger filed this action pursuant to Title 29, United States Code, Section 1132, of the Employee Retirement Income Security Act of 1974 ("ERISA") [29 U.S.C. §§1001 et seq.], challenging Defendant ReliaStar Life's denial of her claim for long term disability benefits. The defendant now moves for summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure. Unless otherwise noted, the following facts appear to be undisputed.

**I.     BACKGROUND**

This case involves a claim for long-term disability ("LTD") benefits under Baptist Heathcare, Inc.'s Group Disability Insurance Plan for employees of Baptist Healthcare, an employee welfare benefits plan sponsored by Baptist Hospital and governed by ERISA.  Defendant ReliaStar Life ("ReliaStar") is the administrator for the Group Disability Insurance Plan ("the Plan") and decides claims and appeals for benefits under the Plan.

In order to be eligible for LTD benefits under the terms of the Plan, the employee must meet the following conditions: "Be insured on the date [the

employee] became disabled and the condition causing [the] disability is not excluded from coverage," and "Be insured on the date the benefit elimination period begins." (Policy, at 6).

In turn, "the benefit elimination period is the length of time [the employee] must be disabled before [she] qualifies to receive any benefits" and "begins on the first day [the employee] sees a doctor and he or she states in writing that [the employee is] disabled because of sickness or accidental injury." (Policy, at 6). An employee is "totally disabled" under the Plan when ReliaStar determines "that a significant change in [the employee's] physical or mental condition due to sickness or accidental injury has caused the following: During the benefit waiting period and the first 36 months of disability benefits, the inability to perform the essential duties of [the employee's] regular occupation." (Policy, at 18).

The Plan excludes coverage for benefits if the disability results from

"Sickness or injury which is the result of a pre-existing condition, if you become disabled during the first 12 months your insurance is in effect. A pre-existing condition is a sickness or accidental injury for which, during the 3 months immediately before the date your insurance started, you did one or more of these:
- Saw a doctor for treatment.
- Received medical services or advice.
- Took prescribed drugs."

Additionally, the Plan states, in relevant part, that the employee's insurance coverage terminates on the earliest of the following dates: "the date [the employee is] no longer actively at work for the Policyholder" or "the date [the employee is] no longer eligible for insurance under the Group Policy." (Policy, at 5). For purposes of termination of coverage, the Plan provides for a Family and Medical Leave Act of 1993 ("FMLA") exception to the "actively at work" status. If an employee has leave from work certified by the employer, then the employee will be considered to be actively at work, and coverage will remain in force as long as the employee

meets the requirements as set forth in the FMLA.  Id.  The Plan also grants ReliaStar final discretionary authority to determine all questions of eligibility and status and to interpret and construe the terms of the Plan.

Rita C. Seger began working full-time for Baptist Hospital on June 21, 2001, as a nurse case manager.  She was eligible for insurance coverage under the Plan on October 1, 2001 (the first month following 90 days after she began working at Baptist Hospital).  In early 2002, Seger began to see her primary care physician, Dr. Tonya Caylor, complaining of a vertiginous type dizziness, in which she felt off balance, with the room seeming to be slightly spinning, and several near syncopal episodes, where she actually fell to the floor.[1]  Dr. Caylor referred Seger to Dr. Daniel Phillips, a cardiologist with the Northwest Florida Heart Group.  In conjunction with Dr. Phillips, another cardiologist, Dr. Charles Morgan, examined Seger on February 26, 2002, at which time the plaintiff complained that she was frequently dizzy, chronically felt tired, and on occasion when she stood up, her heart beat rapidly.

On March 21, 2002, at Dr. Phillip's request, another cardiologist, Dr. Charles Thompson, performed an extensive autonomic nervous system test, which included an extended tilt table test.  Based on his observations during the autonomic nervous system test, Dr. Thompson diagnosed Seger with dysautonomia, a condition affecting the autonomic nervous system in which various orthostatic or positional changes may lead to variations in heart rate, blood pressure, and fainting.

Dr. Thompson's final assessment included the following observations:

"(1) Abnormal autonomic reflex regulation (dysautonomia).
 (2) Marked hyperparasympathetic responsiveness as evidenced by the marked oscillations that we see in heart rate and a blunting that we see in heart rates on the tilt table test.
 (3) Orthostatic intolerance as evidenced by symptoms of

---

[1] Rec. 141 & 142.

orthostatic intolerance and a pattern of abnormal venous pooling.

(4) A pattern that can be consistent with neurocardiogenic syncope and the patient had such oscillating heart rates, the marked oscillations could lead to patient's symptoms."

Thus, Dr. Thompson opined that Seger's objective findings were consistent with her neurocardiogenic syncope, and her pattern of heart rate was consistent with orthostatic intolerance. Dr. Thompson recommended that Seger avoid excessive heat, stress, and fatigue, and that she drink plenty of fluids.

On April 9, 2002, Seger had a follow-up appointment with Dr. Phillips for "discussion and evaluation with regard to her dysautonomia." Dr. Phillips commented that the dysautonomia testing was available and "patient does have a positive tilt table test." As treatment, Dr. Phillips started Seger on various medications, and recommended that she return for a follow-up visit in one month.

On May 20, 2002, Seger was hospitalized at West Florida Hospital in Pensacola for severe chest pain. While hospitalized, the doctors who examined Seger were unable to identify the actual cause of her chest pain. One doctor at the hospital, Dr. Calvit, noted that it was possible that Seger's chest pain was caused by gastroesophageal reflux disease, and recommended that Seger take acid blockades for approximately two months. Seger's hospital discharge summary indicated that the final diagnoses were chest pain due to reflux esophagitis, dysautonomia, hypertension, chronic obstructive pulmonary disease with asthmatic bronchitis, and degenerative joint disease. Dr. Phillips' impression of Seger's condition at that time also included chest pain of *an uncertain etiology* and autonomic dysfunction. Seger was discharged from the hospital on May 24, 2002. Although none of Seger's medical records indicate that she was determined to be disabled upon discharge, Seger did not return to work after May 20, 2002. Instead, Seger remained off work on medical leave.

In a follow up visit with Dr. Caylor on June 10, 2002, Seger reported that she was suffering from depression, and complained that there was "something wrong with me somewhere," and that no one could get to the bottom of it.  She also complained at that time that her bones chronically ached, and she felt that she had something related to a celiac sprue which caused her to get rashes frequently.  On this visit, her main complaint was related to her frequent infections.  However, Dr. Caylor made the following note, "While we were finishing up her workup, I don't believe she can concentrate and focus on her work at this point.  She hasn't recuperated from her hospital stay.  Will continue to leave her off work."  Dr. Caylor determined that she would reassess Seger's condition in four to six weeks.

Dr. Caylor also referred Seger to Dr. Jack Clark, a rheumatologist, to assess for any possibility of underlying connective tissue disorder relating to her chronic pain, and to examine Seger's arm for cellulitis.  On June 12, 2002, Seger saw Dr. Clark, chiefly complaining of aching in her left ankle, and that her left leg hurt as well.  She also indicated that she had had diffuse pain for many years, and that her sleep disturbances began approximately a year prior.   During Dr. Clark's examination of Seger, he noted trigger points in her shoulder, arm, neck, back and buttocks area.  Dr. Clark's impression was that Seger had "evidence of an illness similar to fibromyalgia," and he recommended that she begin physical therapy, including a water aquatic program, behavioral modification, and post-rehab fitness.

Seger began her physical therapy with West Florida Rehabilitation Institute Healthworks on June 24, 2002, where she reported that she was unable to sit, stand, or walk for more than thirty minutes due to pain in her lower back and neck region.   The physical therapist noted that Seger had tenderness around the bilateral greater trochanteric region over the bursa and the greater trochanter itself.

A couple of days after Seger began her physical therapy, she visited Dr. Caylor, complaining of myalgias and sleep disturbance. Dr. Caylor noted that Seger

had been on Wellburtin for her depression since her last visit, but that Seger's depression was still fairly significant.  In her final report, Dr. Caylor stated, "With all the interventions that Dr. Clark is doing and the different medications that we are using, I feel it would take her at least six weeks to get back on her feet to where she can return to full time work.  At this point, I do not believe that would be beneficial and, in fact, would be detrimental to her condition at this time."

On that same day, June 26, 2002, Seger also saw Dr. Clark.  Dr. Clark indicated that Seger's chief complaint during that visit was poor sleep.  During his examination, Dr. Clark again noted tender trigger points along Seger's back area, and he prescribed Darvocet to be taken in conjunction with her other medications. He indicated that he would follow up with Seger in three months to monitor her progress with physical therapy.  Dr. Clark also encouraged Seger to enroll in a fibromyalgia support group.

On August 1, 2002, Seger again saw Dr. Caylor, complaining mainly of light-headedness and orthostatic dizziness, along with a spinning vertiginous type dizziness, that had been present fairly constantly for at least two days.  Dr. Caylor advised the plaintiff to contact Dr. Phillips the following day.  On August, 7, 2002, Seger returned to Dr. Caylor for her six-week followup visit.  During this visit with Dr. Caylor, Seger reported that "she and her husband feel that she is not to the point where she can handle going back to work at this time, emotionally or physically."  Seger further reported that her myalgias continued, and Dr. Caylor noted that Seger had a "continued limited ability to function and work secondary to anxiety, depression, sleep disturbance, myalgias and dysautonomia."  Therefore, Dr. Caylor extended Seger's medical leave another seven weeks, but wrote, "I have asked that she discuss with Dr. Clark and Dr. Thompson their feelings on her longer disability.  Any future work-related decisions will come from either one of their offices."

Apparently, Seger's medical leave expired on August 26, 2002, at which time her employment at Baptist Hospital terminated.  Seger applied for LTD benefits in November of 2002.  In support of her claim, which was received by ReliaStar on November 26, 2002, Seger submitted an Attending Physician's Statement of Disability from Dr. Thompson wherein he stated that the primary medical conditions supporting Seger's disability were fibromyalgia and dysautonomia.  Under the heading "Diagnostic Tests Performed," he identified the Autonomic Nervous System Test of March 21, 2002.  He further stated that he had advised Seger to cease working due to these conditions on September 5, 2002, and that Seger had never been hospitalized for those conditions, which he described as "continuous."

In response to Seger's disability claim, ReliaStar retained Dr. Mark H. Johnson, an internal medicine physician, to review Seger's medical records and to determine: (a) if Seger was receiving treatment for either fibromyalgia or dysautonomia during the preexisting condition time period; and (b) whether the records showed that she was impaired from performing her own occupation due to fibromyalgia or dysautonomia.  Dr. Johnson concluded that during the preexisting condition period, Seger had been regularly treated by a chiropractor, Dr. David Edge, for symptoms related to fibromyalgia, such as aches and pains involving the upper and lower spinal areas, and multiple joints, and she was prescribed medication for these symptoms.  Thus, he believed that the fibromyalgia was a preexisting condition.  Dr. Johnson further concluded that there was no documentation of any impairment or function loss related to the dysautonomia or fibromyalgia of sufficient severity to cause disability.

Based on Dr. Johnson's medical records review, on January 8, 2003, ReliaStar notified Seger that her application for long-term disability benefits was denied.  ReliaStar explained to Seger that her claim was denied based on its determination that Seger had treated for fibromyalgia during the Plan's preexisting

condition period, which precluded her from coverage for any disability due to that sickness.  Further, ReliaStar recited Dr. Johnson's conclusion that the medical records showed insufficient evidence of a disability which would prevent Seger from performing the essential duties of her occupation.

On August 7, 2003, Seger appealed the adverse claim decision to ReliaStar. In support of her appeal, Seger reiterated that her dysautonomia was a disabling condition which prevented her from performing her work as a nurse case manager. Seger also explained that the treatment she received from Dr. Edge during the preexisting condition period was related to whiplash injuries from a car accident in which she was involved.  In addition, Seger asked ReliaStar to consider her "reflux esophagitis, hypertension, COPD, chest pain and medication side effects (drowsiness)."

Upon receipt of Seger's appeal, ReliaStar again asked Dr. Johnson to analyze the medical records relating specifically to dysautonomia.  In response, Dr. Johnson explained that dysautonomia is a recognized condition in which orthostatic or positional changes may cause variations in heart rate, blood pressure, and fainting. However, Dr. Johnson opined that there was no objective medical evidence that Seger actually had dysautonomia.  Dr. Johnson concluded that "Ms. Seger has substantial mental illness, and has a history of depression, anxiety, and panic disorder.  Considering only her documented physical problems, however, there is no evidence in the records to support the view that she cannot work as a Registered Nurse, and no medical support for the presence of a disabling condition."

Following receipt of Dr. Johnson's medical records review, ReliaStar then attempted to obtain an independent medical chart review, and notified Seger that it had retained a physician to perform that review.  However, ReliaStar's repeated efforts to obtain an additional independent medical chart review proved unsuccessful, and ReliaStar ultimately proceeded to make a decision based on its

own review of the records and Dr. Johnson's review.

After not receiving a final decision from ReliaStar within the time period designated by the Plan and ERISA regulatory guidelines for deciding a plan participant's appeal, Seger filed this action on January 20, 2004, seeking benefits under the terms of the Plan. ReliaStar received notice of Seger's complaint on February 11, 2004. By letter dated February 12, 2004, ReliaStar advised Seger that its Appeals Committee had upheld the initial decision to deny Plan benefits. Essentially, the denial letter states the following reasons: (1) Seger was treated for symptoms related to fibromyalgia during the Plan's preexisting period; (2) Seger's benefit elimination period did not begin until after Seger's insurance coverage had terminated; and (3) there was insufficient evidence to establish that Seger was totally disabled due to dysautonomia.

## II.    DISCUSSION

### A.    Summary Judgment Standard

A motion for summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(c), Fed. R. Civ. P. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265, 273 (1986). See also Morisky v. Broward County, 80 F.3d 445, 447 (11th Cir. 1996).

However, summary judgment is improper "if a reasonable fact finder

evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 594 (11th Cir. 1995).  An issue of fact is "material" if it might affect the outcome of the case under the governing law.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202, 211 (1986).  It is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the non-moving party.  Id. See also Matsushita Electric Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538, 552 (1986).

Conclusory allegations based on subjective beliefs are insufficient to create a genuine issue of material fact.  See Leigh v. Warner Bros., Inc., 212 F.3d 1210, 1217 (11th Cir. 2000); Ramsey v. Leath, 706 F.2d 1166, 1170 (11th Cir. 1983). On a summary judgment motion, the record and all reasonable inferences that can be drawn from it must be viewed in the light most favorable to the non-moving party. Whatley v. CNA Ins. Cos., 189 F.3d 1310, 1313 (11th Cir. 1999).

B.    ERISA Standard of Review

Under Title 29, United States Code, Section 1132(a)(1)(B), a participant or beneficiary of an employee benefit plan may initiate civil proceedings to recover benefits due under the terms of the plan. In an ERISA benefit case, the district court sits more as an appellate tribunal than as a trial court. It does not take evidence, and it reviews the plan administrator's determination in light of the record compiled before the plan fiduciary. Leahy v. Raytheon, 315 F.3d 11 (1st Cir. 2002); Perry v. Simplicity Eng'g, 900 F.2d 963 (6th Cir. 1990). ERISA claims are not triable before a jury. Blake v. Unionmutual Stock Life Ins. Co. Of America, 906 F.2d 1525 (11th Cir. 1990). A judge in a nonjury case is entitled to draw inferences and conclusions from undisputed evidentiary facts. Coats & Clark v.

Gay, 755 F.2d 1506 (11th Cir. 1985); Nunez v. Superior Oil, 572 F.2d 1119 (5th Cir. 1978).

ERISA does not provide the standard of review for decisions of a plan administrator. Marecek v. BellSouth Telecomms., Inc., 49 F.3d 702 (11th Cir. 1995). However, in Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115, 109 S. Ct. 948, 103 L. Ed. 2d 80 (1999), the Supreme Court of the United States held that a court must review a denial of benefits de novo, unless "the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Id. If the plan does grant discretion to the plan administrator, then the standard of review is arbitrary and capricious.  The Supreme Court left open the question of how to review a plan administrator's decision in cases where there is an apparent conflict of interest due to the administrator's exercise of discretion and responsibility for paying the claims, and the various Circuit Courts have taken different approaches.  Following the Firestone decision, the Eleventh Circuit has developed a three level standard to govern review of ERISA claims: (1) de novo review where the plan does not grant the administrator discretion; (2) arbitrary and capricious review where the plan grants the administrator discretion; and (3) heightened arbitrary and capricious review where there is a conflict of interest. See, e.g., HCA Health Services of Georgia, Inc. v. Employers Health Ins. Co., 240 F.3d 982 (11th Cir. 2001).

In this case, both parties agree that ReliaStar has discretion under the Plan to interpret the policy.  Also, since ReliaStar was responsible for paying claims and had authority to determine eligibility under the Plan, both parties agree that ReliaStar acted under an apparent conflict of interest, which triggers the Eleventh Circuit's heightened arbitrary and capricious standard of review.  See Brown v. Blue Cross and Blue Shield, 898 F.2d 1556, 1561 (11th Cir.  1990).

However, Seger contends that the merits of her disability claim should be

reviewed by this court using a de novo standard of review because ReliaStar failed to comply with the time limits for reviewing benefits requests as set forth in ERISA regulations promulgated by the United States Department of Labor. Specifically, Title 29, Code of Federal Regulations, Section 2560.503-1 establishes standards for the processing of ERISA disability benefit claims. The regulations direct that an appeal from a denial of benefits must be resolved by the administrator within forty-five days. 29 C.F.R. §2560.503-1(h)(1)(I). An administrator may obtain an additional forty-five days to respond if a special need exists and the claimant receives notice. Id. If an administrator fails to adhere to these time limitations, the claimant "will be deemed to have exhausted the administrative remedies available under the plan and shall be entitled to pursue any available remedies under Section 502(a) of the Act on the basis that the plan has failed to provide a reasonable claims procedure that would yield a decision on the merits of the claim." 29 C.F.R. §2560.503-1(I).[2]

It has been clearly established that once the ERISA regulatory deadline expires, a claimant may bring a civil action to determine the merits of her claim. Massachusetts Mut. Life Ins. Co. v. Russell, 473 U.S. 134, 144, 105 S. Ct. 3085, 87 L. Ed. 2d 96 (1985); Nichols v. Prudential Ins. Co. of America, 406 F.3d 98 (2d. Cir. 2005). However, there is a split among the Circuit Courts of Appeals concerning the appropriate standard of review to be applied when the plan administrator does not issue a decision within the regulatory time frame. See Torres v. Pittston Co., 346 F.3d 1324 (11th Cir. 2003). Some Circuits have held that when the administrator fails to decide an appeal within the regulatory time frame, the administrator receives no deference upon judicial review, since the plan administrator did not exercise any discretion. Nichols v. Prudential Insurance Co. of

---

[2] Title 29, C.F.R. §2560.503-1 was amended in 2000 to delete language which stated that "if the decision on review is not furnished within such time, the claim shall be deemed denied."

America, 406 F.3d 98 (2d. Cir. 2005);  Gilbertson v. Allied Signal, Inc., 328 F.3d 625, 631 (10th Cir. 2003); Jesbian v. Hewlett Packard Co., 349 F.3d 1098 (9th Cir. 2003); Gritzer v. CBS, Inc., 275 F.3d 291 (3d Cir. 2002).  The Fifth, Sixth, and Eighth Circuits have held that the administrator's failure to meet the regulatory deadline does not alter the judicial standard of review.  McGarrah v. Hartford Life Ins. Co., 234 F.3d 1026 (8th Cir. 2000);  Southern Farm Bureau Life Ins. Co. v. Moore, 993 F.2d 98, 101 (5th Cir. 1993);  Daniel v. Eaton Corp., 839 F.2d 263, 267 (6th Cir. 1988).  The Eleventh Circuit has recognized the split among the Circuits, but has not adopted a position on the issue.  See Torres v. Pittston Co., supra, 346 F.3d 1324.

Nevertheless, Seger does not cite any of these cases in arguing that a de novo standard of review is appropriate.  Instead, Seger refers to a Department of Labor ("DOL") statement interpreting Section 2560.503-1(l).  In relevant part, the DOL explained;

> "The Department's intentions in including this provision in the proposal were to clarify that the procedural minimums of the regulation are essential to procedural fairness and that a decision made in the absence of the mandated procedural protections should not be entitled to any judicial deference."  (Employee Retirement Income Security Act of 1974, Rules and Regulations for Administration and Enforcement; Claims Procedures, 65 Fed Reg 70246, 70255 (Nov. 21, 2000)(codified at 29 C.F.R. pt. 2560).

Based upon this statement by the DOL, the Eleventh Circuit has indicated that a district court should, among other considerations, determine whether the DOL's interpretation is entitled to deference, applying the test set forth in Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 866, 104 S. Ct. 2778, 2793, 81 L. Ed. 2d 694 (1984).  See  Torres v. Pittston Co., supra, 346 F.3d 1333 n.11.   In reviewing an administrative agency's interpretation of a statute, Chevron requires a court to apply a two-step analysis.  See Georgia Power

Co. v. Teleport Communications, 346 F.3d 1033, 1044 (11th Cir. 2003).  The first Chevron step is to determine whether "Congress has directly spoken to the precise question at issue."  Chevron, supra, 467 U.S. at 842-43, 104 S. Ct. at 2781. Here, it is clear, based upon Firestone v. Bruch, supra, 489 U.S. 101, 115, 109 S. Ct. 948, that Congress has not addressed the judicial standard of review to be applied in ERISA cases.

If the statute in question is silent or ambiguous, then Chevron directs a court to determine whether the agency's construction of the statute is permissible.  Id. at 843, 104 S. Ct. at 2782.  If so, the agency's interpretation is entitled to substantial deference.  Id.  Significantly, in determining whether an agency's interpretation of a statute is permissible, an important consideration is whether an agency has exceeded the scope of its delegated authority.  United States v. Mead, 533 U.S. 218, 226, 121 S. Ct. 2164, 150 L. Ed. 2d 292 (2001)("deference to an agency's interpretation of a statute is due only when the agency acts pursuant to 'delegated authority.'"); Adams Fruit Co. v. Barrett, 494 U.S. 638, 649, 110 S. Ct. 1384, 108 L. Ed. 2d 585 (1990).  See also Bowen v. Georgetown University Hospital, 488 U.S. 204, 208, 109 S. Ct. 468, 102 L. Ed. 2d 493 (1988)("It is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress.")

The Supreme Court of the United States has previously rejected an agency's attempt to regulate the scope of judicial power in adjudicating rights, absent a clear delegation of authority from Congress. See Adams Fruit Co. v. Barrett, 494 U.S. 638, 649, 110 S. Ct. 1384, 108 L. Ed. 2d 585 (1990).   At issue in Adams Fruit was a Department of Labor regulation promulgated under the Migrant and Seasonal Agricultural Worker Protection Act ("AWPA"), 29 U.S.C. §1801 et. seq.   In the enforcement provision of the AWPA, Congress provided a private right of action to migrant farm workers who were injured because of failure to comply with the

AWPA's motor vehicle safety provisions.  Congress delegated regulatory authority to the Department of Labor to "prescribe the standards required for the purposes of implementing this section." 29 U.S.C.  1841(d).  Based upon this delegation, the Secretary promulgated a regulation which provided that state workers' compensation laws, where they existed, provided the exclusive remedy for injured migrant workers.  Adams Fruit, supra, 494 U.S. at 649, 110 S. Ct. 1384.

In determining whether to afford Chevron deference, the Supreme Court emphasized that "a precondition to deference under Chevron is a congressional delegation of administrative authority." Id. at 649, 110 S. Ct. at.    The Adams Fruit Court reasoned that by including a statutory enforcement provision, which created a federal right of action for migrant workers, Congress "expressly established the Judiciary and not the Department of Labor as the adjudicator of private rights of action arising under the statute." Id.  Accordingly, the Supreme Court held that "it would be inappropriate to consult executive interpretations of §1854 to resolve ambiguities surrounding the scope of AWPA's judicially enforceable remedy."  After recognizing that the AWPA did envision a role for the Department of Labor in implementing standards to carry out the statute's provisions, the Supreme Court stated, "(t)his delegation, however, does not empower the Secretary to regulate the scope of the judicial power vested by the statute.  Although agency determinations within the scope of delegated authority are entitled to deference, it is fundamental 'that an agency may not bootstrap itself into an area in which it has no jurisdiction.'" Id. at 640, 110 S. Ct. at 1391 (citing Federal Maritime Comm'n v. Seatrain Lines, Inc., 411 U.S. 726, 745, 93 S. Ct. 1773, 1785, 36 L. Ed. 2d 620 (1973)).

Similar to the statute at issue in Adams Fruit, ERISA provides a judicially enforceable remedy for participants of an ERISA plan.  See 29 U.S.C. §1132. Significantly, the enforcement provision of ERISA, relied upon by Seger in bringing

this claim, permits a participant to recover benefits *under the terms of the plan*.  Id. at (a)(1)(B) (emphasis added).  This seems to be an acknowledgment that the plans are privately established and funded by employers on a voluntary basis.  Thus, ERISA delegates authority to the federal judiciary to determine *under the terms of the plan*, rather than pursuant to ERISA regulations, whether a participant is entitled to benefits.[3]

Moreover, the DOL's authority to enact the regulatory deadlines at issue was delegated by Congress pursuant to Section 503 and Section 505 of ERISA.  See 29 CFR §2560.503-1 (a).  Section 503 of ERISA requires an employee benefit plan, in accordance with the Secretary's regulations, to "afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim."  29 U.S.C. §1133.  Section 505 of ERISA authorizes the Secretary of Labor to "proscribe such regulations as he finds necessary or appropriate to carry out the provisions of this subchapter." 29 U.S.C. §1135.

Therefore, the statute requires only that a participant whose claim for benefits has been initially denied by the plan have an opportunity for a "full and fair review" by the plan's named fiduciary.  The Secretary may properly find that any procedure not in compliance with the regulatory deadlines would deny participants "a reasonable opportunity" for the "full and fair review by the appropriate named fiduciary" required by Section 503.  This delegation, however, does not empower the Secretary to regulate the scope of the judicial power vested by the statute.

Instead, the Eleventh Circuit has directed courts to consult common law

---

[3] By contrast, ERISA grants the Secretary authority to carry out various other enforcement measures, including bringing a civil action against a plan administrator to enforce the fiduciary provisions of ERISA, 29 U.S.C. §1132(a)(2), to *enjoin* any act which violates certain ERISA provisions, Id. at (a)(5), and to assess civil penalties against a plan administrator, See e.g., Id. at (c)(1) - (c)(4).

trust principles to evaluate the application of the arbitrary and capricious standard of review to ERISA benefits claims.  Brown v. Blue Cross and Blue Shield, supra, 898 F.2d  at 1564.  Similarly, the Circuits which have applied de novo review to an administrator's untimely decision have uniformly determined that de novo review was appropriate based on an application of trust principles and Firestone, rather than out of deference to the DOL's interpretation of its own regulations.   For instance, in Gilbertson v. Allied Signal, Inc., supra, 327 F.3d at 632, the Tenth Circuit reasoned that Firestone allowed for deferential review, instead of de novo, only when the administrator's decision is an exercise of "a discretion vested in them by the instrument under which they act."   Id. (citing Firestone, 489 U.S. at 111, 109 S. Ct. at 948.   The Gilbertson Court explained that the substantial deference usually accorded a trustee's decision was inappropriate in that case because the plan administrator never issued a final, reasoned decision on the claim, so there was no application of reasoned judgment to which a court could defer. Id.; See also Jesbian, supra, 349 F.3d at 1104 ("decisions made outside the boundaries of conferred discretion are not exercises of discretion" and are not entitled to deferential review); Gritzer v. CBS, Inc., supra, 275 F.3d at 296 ("[I]f a trustee fails to act or to exercise [its] discretion, de novo review is appropriate because the trustee has forfeited the privilege to apply his or her discretion; it is the trustee's analysis, not his or her right to use discretion or a mere arbitrary denial, to which a court should defer.")

Notwithstanding the rationale behind applying a de novo review in certain situations, even the cases which find de novo review appropriate acknowledge that it is not a "hair-trigger rule." Finley v. Hewlett-Packard Co. Employee Benefits, 379 F.3d 1168, 1173-74 (10th Cir. 2004).  Instead, these Circuits have adopted a "substantial compliance" exception, which considers whether there has been an ongoing good-faith exchange of information between the plan administrator and the

claimant.  In carving out the substantial compliance exception, the Tenth Circuit expressed a concern that a bright-line <u>de</u> <u>novo</u> review rule, which did not consider a plan administrator's good-faith attempt to issue a timely decision, would

> "inhibit collection of useful evidence and create perverse incentives for the parties. Even in cases where additional medical information is clearly necessary for a proper decision, administrators would have an incentive to issue a final denial on the inadequate record in order to preserve their right to deferential review, rather than to wait for the information and risk losing deference."
> <u>Id.</u> at 635.

Similarly, in <u>Jesbian</u>, <u>supra</u>, 349 F.3d at 1103, the Ninth Circuit held that deference is still due where the plan administrator is "engaged in a good faith attempt to comply with its deadlines when they lapse." <u>Id.</u> The <u>Jesbian</u> court also recognized that a hard and fast <u>de</u> <u>novo</u> rule would lead to "hasty decisionmaking by administrators so as to slip under the 120-day wire" or "delay by claimants so as to ensure a deemed denial," <u>Id.</u> at 1107.

On the other side of the coin, however, these cases recognize that ERISA's regulatory deadlines play a role in ensuring a "full and fair" review, where a crucial element of *fairness* to the claimant involves a timely decision in which the administrator is diligently working on the claim rather than stalling for time by asking for endless additional evidence.  While the Eleventh Circuit has not decided whether a deemed denial entitles a claimant to <u>de</u> <u>novo</u> review, it has acknowledged the possibility of "ongoing exchanges between [the plan administrator and the claimant] warranting time extensions," or the fact that the insurer issued a determination before receiving notice of a suit, albeit past the regulatory deadline, might "arguably negate the purpose of applying <u>de</u> <u>novo</u> review to an ordinary deemed denial, in which there is no exercise of administrative discretion to be reviewed." <u>Torres v. Pittson Co.</u>, <u>supra</u>, 346 F.3d at 1333-34.

In this case, there is no dispute that ReliaStar technically failed to decide

Seger's appeal within the time limits imposed by the ERISA regulations and the Plan itself.[4]   ReliaStar received Seger's letter of appeal on August 12, 2003.  Thus, in accordance with ERISA regulations, absent an extension, ReliaStar was required to make a decision on the appeal within 45 days, which would have been by September 26, 2003.  Since ReliaStar requested an extension, the deadline was extended until approximately November 10, 2003.  Nevertheless, ReliaStar did not issue its final decision upholding its denial of Seger's claim for benefits until February 12, 2004 - - - approximately 90 days past the extended ERISA regulatory deadline.

Obviously, ReliaStar's decision was not within the regulatory deadline, but an examination of the unusual facts of this case reveals that ReliaStar was engaged in a good faith attempt to comply with the deadlines, and ReliaStar attempted to reasonably keep Seger informed regarding the delay in processing her claim.  Unlike the plan administrators in Jesbian and Gilbertson, ReliaStar did not ignore Seger's appeal until the last possible minute.  Instead, almost immediately upon receiving notice of Seger's appeal, ReliaStar requested that Dr. Johnson review her file again and evaluate the new medical evidence submitted by Seger.

ReliaStar also contacted Seger and requested further information.  On September 29, 2003, ReliaStar determined that it needed to obtain an additional independent medical review of Seger's chart by a rheumatologist.  To this end, ReliaStar retained United Review Service ("URS") to set up the independent medical review. URS, in turn, retained Dr. Michael Burnette, a rhuematologist located in Tampa, Florida.  On this same day, ReliaStar informed Seger of the progress of her claim, noting its intention to submit her file for an independent review and that an

---

[4]  While ERISA's regulations now allow only 90 days for a plan administrator to issue a final decision on a claimant's appeal, the Plan is actually patterned after ERISA's former regulations which allowed a plan administrator up to 120 days.

extension would be necessary.   This same letter also informed Seger that a decision on her claim would be made no later than November 10, 2003 - - - representing the 90-day regulatory deadline.

Unfortunately, while ReliaStar may have acted in an expedient manner concerning Seger's file, the rheumatologist hired to perform the independent medical review did not.  In fact, the physician hired by URS, Dr. Burnette, did not ever complete the report for ReliaStar.  Significant to a determination of whether ReliaStar abandoned its discretion under the terms of the Plan, however, the record reveals that ReliaStar did not idly wait, but instead made numerous attempts to rush the review of Seger's file.  For example, on October 31, 2003, ReliaStar sent an e-mail to the URS contact, stating, "I must have the report by 9:00 a.m. Tuesday, 11/4/03.  The appeal committee meets on that day.  They don't meet again for another week.   The ING appeal decision has to be postmarked by 11/10/03."   In response to ReliaStar's numerous, sometimes tri-daily, e-mails requesting the medical review, URS assured ReliaStar that they had been attempting to contact the physician, but they had received conflicting stories as to the status of the file. While the stories may have been conflicting, the one consistency was that the physician repeatedly assured ReliaStar, as relayed through URS, that the report had been completed and would be on their desk shortly.    In the end, it appears that the physician was simply engaging in dilatory tactics, and fabricating excuses to stall the completion of the report.[5]

_____

[5] Apparently, Dr. Burnette first informed URS that he had an emergency which delayed his review of the record, but it had been completed and only needed to be transcribed.  On November 18, 2003, ReliaStar again requested the status of the medical review and asked URS if they would be receiving it soon.  URS responded, "Yes, the transcriptionist is faxing it over, I just got off the phone.  She will call me as soon as it is faxed.  Oh thank God!."  When the report had still not be received, Dr. Burnette apparently informed URS that he was going to find the transcriptionist himself and make sure the report was sent that day. Finally, on November 25, 2003, URS informed ReliaStar that the physician's secretary had confirmed that the physician

In the meantime, while ReliaStar attempted to secure the independent medical review, it also updated Seger via letter, informing her that ReliaStar was still waiting to receive the chart review from the physician.  These letters briefly explained the delay to Seger and marked a new date in which Seger could expect her appeal, which was always shortly after the time in which the physician had promised ReliaStar he would have the report completed.

Finally, in December 2003, ReliaStar gave up on Dr. Burnette, and requested an independent medical review from another physician who promised to have it completed within a couple of weeks.  ReliaStar advised URS that Seger's file review should have "top priority" as the deadline for review had already passed. On February 4, 2004, URS relayed to ReliaStar that the second independent medical reviewer was unable to determine disability from Seger's medical records because information was missing.  At this point, ReliaStar concluded that it must make a decision on Seger's appeal without the benefit of an independent medical review due to the lengthy delay.  Accordingly, ReliaStar issued its final decision denying Seger's claim for benefits on February 12, 2004.

This case does not present a situation in which the plan administrator ignored the claimant's appeal, essentially relinquishing its conferred discretion. Instead, ReliaStar, as the plan administrator, exercised its discretion in determining that an independent medical review was necessary in order to achieve reasoned decision-making.   Given ReliaStar's repeated efforts to obtain the independent medical review, and the fact that it advised Seger of the cause underlying the delay of her appeal, Seger was not deprived of a full and fair review of her claim.  The record plainly reflects that ReliaStar made a good-faith effort to comply with ERISA's regulatory deadline while still attempting to provide Seger a reasoned and

---

had been fabricating the story about the transcriptionist the entire time.  In fact, he had never completed the review, citing an emergency as his excuse.

informed decision.  Therefore, Seger is entitled only to the heightened arbitrary and capricious standard of review.

In applying the heightened arbitrary and capricious standard, the first question is whether, from a perspective of *de novo* review of the administrative record, the administrator's decision was "wrong."    Williams v. BellSouth Telecommunications, Inc., 373 F.3d 1132, 1138 (11th Cir 2004).   If the court agrees with the claim administrator's decision, *i.e.* that the decision was "right," the court's inquiry ends and the administrator's decision is affirmed.  If the decision was wrong, the next step is to determine whether the administrator's decision was nevertheless reasonable in light of the information known to the administrator at the time the decision was made (and thus whether the administrator's determination was "arbitrary and capricious" in light of the discretion afforded to the administrator).  Id.  If no reasonable grounds exist in the record to support the administrator's decision, the decision must be overturned.   Id.   However, if reasonable grounds do exist in the record, but a reasonable basis in the record for granting the claim also exists, the court is to evaluate whether the administrator was operating under a conflict of interest when it made its determination (a fact which is stipulated here).  Id.

Where such a conflict of interest exists, the Eleventh Circuit has merely instructed district courts to "apply heightened arbitrary and capricious review." Id.; Torres, supra, 346 F.3d at 1332.  In Brown v. Blue Cross & Blue Shield, 898 F.2d 1556, 1566 (11th Cir. 1990), the Eleventh Circuit had held that where an insurer/claims administrator operating under a conflict of interest bases its decision on a particular interpretation of the plan language, "heightened" arbitrary and capricious review means that the burden shifts to the insurer to "prove that its interpretation of the plan provisions committed to its discretion was not tainted by self-interest."   Id.   The Eleventh Circuit further explained that "a wrong but

apparently reasonable interpretation is arbitrary and capricious if it advances the conflicting interests of the fiduciary at the expense of the affected beneficiary or beneficiaries unless the fiduciary justifies the interpretation on the ground of its benefit to the class of all participants and beneficiaries." Id. at 1566-67.

However, Brown addressed the application of heightened arbitrary and capricious review to a plan administrator's interpretation of the *plan language*, as opposed to the plan administrator's interpretation of the facts in the record.   In Torres v. Pittson Company, supra, 346 F.3d 1324, the Eleventh Circuit expanded the Brown holding and held that Brown's heightened arbitrary and capricious standard of review should be applied to both plan interpretations and factual determinations of ERISA claims administrators.   Nevertheless, the Eleventh Circuit did not specifically address what evidence may indicate that the administrator's factual determination, as opposed to its plan interpretation, was not motivated by self-interest.   In a plan interpretation case, a defendant may satisfy the burden of removing the taint of self-interest by proving that its plan interpretation has the effect of benefitting the class of participants and beneficiaries.   Plan interpretation is much like a legal determination, which is relatively easy to review administratively or judicially.   However, rote application of the two-pronged burden shifting Brown analysis in the context of factual determinations is less intellectually useful.   As applied, this shifting burden places a greater evidentiary load upon the administrator than does *de novo* review, while factual findings must necessarily be entitled to a deferential review.   How can this be done?

I conclude that, where "heightened" arbitrary and capricious review of a conflicted administrator's factual determination is required, Brown's two step inquiry must seek to more realistically evaluate the fairness of the factual determination.   The fundamental burden shifting framework employed by the Brown court can be applied.   An administrator's decision to deny benefits that was

supported by reasonable grounds in the record, but which also rejects credible evidence of disability submitted by the claimant, has the practical effect of advancing the administrator's self-interest, and the burden shifts to the administrator "to prove that its decision was not tainted by self interest." Brown, supra, 898 F.2d at 1566-67.   The administrator can carry this burden by demonstrating the thoroughness and evenhandedness with which the claims review process was conducted.   Evidence of procedural anomalies, reversing an initial grant of benefits without receiving additional evidence, self-serving selectivity in the use of evidence, or an apparent bias in decision-making to the benefit of the insurer are all relevant factors in assessing whether the decision-making process was tainted by self-interest.   See, e.g., Pinto v. Reliance Std. Life Ins. Co., 214 F.3d 377, 393 (3d Cir. 2000)(in applying heightened arbitrary and capricious review to conflicted administrator's factual determinations "we look not only at the result – whether it is supported by reason – but at the process by which the result was achieved."); Russell v. Paul Revere Life Ins. Co., 148 F. Supp. 2d 392, 406 (D. Del. 2001).   Whether the decision was supported by an independent medical evaluation, where available under the terms of the plan, may also demonstrate the objectiveness of the claim evaluation.

### C.    Preexisting condition

After reviewing Seger's medical records, ReliaStar denied Seger's disability claim, in part, based on its determination that Seger had received treatment for symptoms related to her fibromyalgia during the Plan's preexisting condition period. As noted earlier, the Plan excludes coverage for any disability for which Seger was treated during the preexisting period.   Because Seger's coverage began on October 1, 2001, the applicable preexisting period ran from July 1, 2001, to October 1, 2001.    ReliaStar claims that during this period, Seger was treated by her

chiropractor, Dr. David Edge, for the same symptoms which ultimately resulted in the fibromyalgia diagnosis, including multiple aches and pains involving the upper, mid, and lower spinal areas.  Seger responds that she was treated by Dr. Edge for injuries arising from a May 9, 2001, automobile accident,[6] and her reports of pain during the preexisting condition period were completely unrelated to her fibromyalgia.  Seger argues in her memorandum in opposition to summary judgment that ReliaStar is "essentially claiming that because Seger was treated for back pain during the lookback period, and back pain is a symptom of fibromyalgia, that Seger must have been treated for fibromyalgia during the lookback period."    However, the record establishes more than just a tenuous connection of "back pain" between Dr. Edge's treatment of Seger and the treatment of Seger for fibromyalgia by Dr. Caylor, Dr. Clark, and Dr. Vandenburg.

It is important to note that a diagnosis of fibromyalgia is based almost solely on the patient's subjective reports of pain.  Fibromyalgia is a relatively new term, first appearing within the last thirty years or so, and generally applied to a set of subjective complaints for which the cause could not be determined.  As explained by the Seventh Circuit in Hawkins v. First Union Corporation Long-Term Disability Plan, 326 F.3d 914, 916 (7th Cir.2003)(quoting Sarchet v. Chater, 78 F.3d 305, 306-07 (7th Cir.1996)):

> "[F]ibromyalgia, also known as fibrositis [is] a common, but elusive and mysterious, disease, much like chronic fatigue syndrome, with which it shares a number of features. Its cause or causes are unknown, there is no cure, and, of greatest importance to disability law, its symptoms are entirely subjective. There are no laboratory tests for the presence or severity of fibromyalgia. The principal symptoms are 'pain all over,' fatigue, disturbed sleep, stiffness, and - - - the only symptom that discriminates between it and other diseases of a

---

[6] Reliastar does not dispute that Seger was involved in an automobile accident on May 9, 2001, approximately six weeks before she began her employment at Baptist Hospital.

rheumatic character - - - multiple tender spots...." .

Therefore, with an illness such as fibromyalgia, symptomatic complaints are especially relevant since the diagnosis is based almost solely on a patient's subjective reports of pain.    Seger repeatedly reported lower back, neck, and headache pain to Dr. Edge between July 1 and October 1, 2001.[7]    Seger's complaints of neck, back, and headache pain continued on almost every visit to Dr. Edge's office, averaging approximately three visits per week, during the preexisting period.  Further, on multiple occasions, Dr. Edge noted  "trigger points" in Seger's spinal area, as well as her buttocks.[8]   In addition to "trigger points," Dr. Edge repeatedly noted myofascitis and myospasms in Seger's body.

With respect to her current diagnosis of fibromyalgia, on June 10, 2002, Seger complained to Dr. Caylor, her general practitioner, that her "bones chronically ache."  On June 12, 2002, Dr. Clark, similar to Dr. Edge, noted "trigger points" in various areas of Seger's body, including the "low cervical and bilateral gluteal region."    Significantly, Seger explained to Dr. Clark at that time that she "has had diffuse pain for many years and sleep disturbance began about one year ago." Dr. Clark also noted multiple myalgias, or muscle pains.  Similarly, on September 25, 2002, Dr. VandenBerg observed "trigger" or "tender" points and mentioned fibromyalgia as a possible diagnosis.

In addition to the similarity of symptoms reported, Dr. Edge's final analysis of Seger's condition shows a striking similarity between the two diagnoses.   In an exit summary, Dr. Edge eventually diagnosed Seger with, among other things, Lumbopelvic Myfascial Pain Syndrome.   According to the summary and definition of

_____

[7]    Seger began receiving chiropractic treatments from Dr. Edge on June 4, 2001.

[8]  See Dr. Edge's notes on August 13, 2001; August 22, 2001, and September 28, 2001.

fibromyalgia and myofascial pain syndrome contained in the record, the distinction between fibromyalgia and myofascial pain syndrome is that fibromyalgia is a generalized pain syndrome characterized by symptoms of widespread pain, whereas myofascial pain syndrome is a similar syndrome in which pain and tenderness are localized to one or a few discrete areas.   In other words, the distinction between myofascial pain syndrome and fibromyalgia is essentially one of degree rather than of kind.

Moreover, it is notable that Seger's treatment under Dr. Edge for injuries allegedly related solely to her vehicle accident continued throughout the time in which Seger also began reporting to her general practitioner, as well as Dr. Clark, that she was feeling pain in her neck and lower back, and that she was having chronic headaches.  In fact, Seger continued treatment with Dr. Edge for her injuries up until July 30, 2002, at which time Dr. Edge determined that Seger had reached maximum medical improvement.   However, Seger also began physical therapy for her fibromyalgia symptoms on June 24, 2002, mainly complaining of neck and low back pain.[9] Thus, the pain Seger reported during her preexisting period did not dissipate or ease during any point before she began complaining of the same symptoms to Dr. Caylor and Dr. Clark, who ultimately diagnosed her with fibromyalgia.

After reviewing the record, I agree with ReliaStar's conclusion that Seger was treated for symptoms related to fibromyalgia during the preexisting period of the Plan, and I find that ReliaStar's decision was "right."   ReliaStar's decision on her preexisting condition is fully supported in the record by competent, substantial

---

[9] Although Seger continued treatment with Dr. Edge during the same time period that she began complaining of headaches, neck pain, and low back pain to her other physicians, none of the physician's notes indicate that Seger informed Dr. Caylor, Dr. Clark, or Dr. Thompson that she had been involved in a vehicle accident or that she had been, and was still, receiving chiropractic treatment for many of the same symptoms of which she complained to them.

evidence.

    D.    <u>Total Disability Due to Dysautonomia</u>

ReliaStar's conclusion that Seger is excluded from coverage for fibromyalgia does not end the court's inquiry, however.  Seger's claim for long term disability benefits is also based on her diagnosis of dysautonomia.  ReliaStar denied Seger's long-term disability claim, in part, because it determined that Seger's physician did not advise her to cease work until September 5, 2002, at which time ReliaStar contends Seger was not eligible for coverage under the plan.  Since Seger's FMLA coverage terminated on August 26, 2002, and her employment with Baptist Hospital ended on that same date, Seger was not insured as of August 26, 2002, according to the terms of the Plan.  Therefore, the record must establish that at some time before August 26, 2002, Seger's benefit elimination period began, i.e., Seger saw a doctor who stated in writing that she was unable to perform the essential duties of her regular occupation because of sickness or accidental injury.

While Dr. Thompson's "Attending Physician's Statement of Disability," completed on November 21, 2002, indicates that he advised Seger to cease working as of September 5, 2002,[10] there are several other medical records which establish that another doctor stated in writing that Seger was unable to perform the essential duties of her job prior to August 26, 2002.  As early as June 10, 2002, Dr. Caylor wrote that Seger could not return to work because she had not

_____

[10]    Although Dr. Thompson also indicated on the Attending Physician's Statement of Disability that he first *treated* Seger on September 5, 2002, a complete review of the record establishes otherwise.   For instance, on March 21, 2002, Dr. Thompson performed an Autonomic Nervous System test on Seger at the request of Dr. Phillips, and assessed her with Dysautonomia.   Further, on August 7, 2002, Dr. Caylor  indicated that she would thereafter refer to Dr. Thompson in making the decision of Seger's continued disability.  Thus, Seger was obviously being treated by Dr. Thompson prior to September 5, 2002.

recuperated from her hospital stay, and Seger could not concentrate and focus enough to perform her job duties.   Also, on August 7, 2002, Dr. Caylor indicated that Seger's short-term disability was due to depression, anxiety, fibromyalgia and <u>dysautonomia</u>.[11]    Dr. Caylor concluded that due, in part, to her dysautonomia, Seger continued to maintain a limited ability to function and work, so she extended Seger's disability leave for at least another seven weeks.  Thus, at least by August 7, 2002, while Seger was still insured under the Plan, Dr. Caylor indicated in writing that Seger was unable to work due, at least in part, to her condition of dysautonomia.

ReliaStar argues in its reply that this note from Dr. Caylor is insufficient because it does not provide that she was also receiving "regular and appropriate care and treatment" as the Plan requires.  However, the record establishes that Seger was being treated on a regular basis by Dr. Phillips, Dr. Thompson, and eventually, by Dr. Vandenberg for symptoms relating to her dysautonomia, and that she was taking prescription medication for her dysautonomia as well.  It is true that Dr. Caylor apparently did not feel qualified to diagnose dysautonomia or to determine whether Seger really had a long term disability.  In fact, on August 7, Dr. Caylor stated that any future work-related decisions concerning long term disability should come from either Dr. Clark or Dr. Thompson, as these were the physicians regularly treating Seger for her illnesses.  Nevertheless, Dr. Caylor did state in writing that Seger had a short term disability due to sickness and was unable to work at her regular job.  That's all the Plan requires.

In focusing solely on Dr. Thompson's statement in the Attending Physician Statement of Disability to determine the date Seger's benefit elimination period began, ReliaStar ignored the earlier medical notes from Dr. Caylor.  ReliaStar's failure to address these prior medical records, thereby ignoring the evidence, was

---

[11] Rec. 132

not in accordance with its fiduciary obligation as the plan administrator under these circumstances. Therefore, under the terms of the Plan, the benefit elimination period began on the first day that "a doctor . . . states in writing that [Seger was] disabled because of sickness  . . . " That occurred before August 26, 2002.

Notwithstanding my conclusion that Seger's benefit elimination period began before her insurance coverage ended, she still must meet the second condition for qualification.  She must establish that she was totally disabled under the terms of the Plan while she was still insured.  In turn, the Plan defines <u>totally</u> disabled as a significant change in the participant's physical or mental condition due to sickness or accidental injury which has caused the participant to become unable to perform the essential duties of her regular occupation.  This is a different inquiry than establishing when Seger's benefit elimination period began because the benefit elimination period only requires a physician's written statement that Seger is disabled because of sickness of accident."  The benefit elimination period is simply triggered by any doctor's written professional statement, even without much supporting evidence - - - it does not require ReliaStar to make its own determination that Seger is totally disabled.   Under ERISA, a plaintiff has the burden of establishing that she is entitled to benefits under the terms of a disability benefit plan. <u>See</u>, <u>e.g.</u>,  <u>Richards v. Hartford Life and Accident Insur. Co.</u>, 356 F. Supp. 2d 1278, 1284 (S.D. Fla. 2004)(citing <u>Stvartak v. Eastman Kodak Co.</u>, 945 F. Supp. 1532, 1536 (M.D. Fla. 1996)).  The plan administrator must be provided evidence establishing total disability.

Dr. Johnson's opinion that Seger is not totally disabled due to dysautonomia is based on two conclusions: (1) there is no objective medical evidence that Seger actually has dysautonomia; and (2) even if there were, there is insufficient evidence to establish that dysautonomia prevents Seger from performing the essential duties of her position.   As to the first conclusion, Dr. Johnson explained to ReliaStar that

Seger's "dysautonomia diagnosis appears to have arisen as a potential explanation for her nonspecific ventricular contractions, but there is no indication that she has such a condition."   Instead, Dr. Johnson suggests that Seger's diagnosis of dysautonomia has simply been passed on from one physician to the next without any clinical and objective findings to support it.  Moreover, he noted the absence of any demonstrable abnormalities of function in her autonomic nervous system.

Dysautonomia is a condition affecting the autonomic nervous system which may cause variations in heart rate, blood pressure, and fainting upon orthostatic or positional changes.  The Autonomic Nervous System Test performed on Seger on March 21, 2002, showed abnormalities in Seger's system.  As a result of the test, Dr. Thompson assessed Seger with "Abnormal autonomic reflex regulation (dysautonomia)."  Dr. Thompson based this assessment on Seger's "markedly abnormal heart rate response" to the screening tilt table test, and his finding that Seger "does show a markedly oscillating heart rate that very rarely reaches an expected heart rate and when it does, it falls very quickly.  I think that this is certainly a set up for neurocardiogenic syncope. . . "

On April 9, 2002, Dr. Phillips confirmed that the Autonomic Nervous System Test indicated that Seger may have dysautonomia, when he noted that Seger did have a "positive" tilt table test and occasional to frequent PVC's.  Dr. Phillips explained, "The patient is seen for a discussion and evaluation with regard to her dysautonomia.  The dysautonomia testing is now available. The patient does have a positive tilt table test.   She also has occasional to frequent PVCs, sometimes bigeminy."[12]

Thus, ReliaStar's conclusion that the March 21, 2002, Autonomic Nervous System test failed to show <u>any</u> abnormalities in Seger's system is not correct.  The

---

[12] Rec. 208. "Bigeminy" is the state of having a pulse with two beats close together, followed by a pause after each pair of beats.

tilt table test did show abnormalities.  In fact, Dr. Phillips noted, when he filled out Seger's Disability Form, under the section titled "Objective Findings Supported By Testing" that Seger had a "positive autonomic nervous system test."[13]

Nevertheless, Seger's medical records are not as clear regarding what physical limitations Seger's dysautonomia placed on her ability to perform the essential duties of her job.  In addition to questioning whether Seger actually had dysautonomia, ReliaStar also concluded that even if she did, the medical records do not indicate that she maintains any impairment or functional loss relating to the condition necessary to support a finding of "total disability."

To support a determination of total disability, Seger emphasizes the medical records dated before August 26, 2002, which indicate that she was totally disabled. However, as will be discussed, these records do not necessarily support a finding of total disability due to dysautonomia.  Instead, most of the medical records relied on by Seger in establishing that she was totally disabled from work before her insurance ended simply contain conclusory statements that Seger is disabled, but they do not indicate the specific physical limitations which prevent Seger from performing the essential duties of her job.  For example, on June 10, 2002, Dr. Caylor's notes only indicated that Seger was unable to work at that time because Seger could not concentrate and focus on her work, but Dr. Caylor further indicated that this was due to the fact that Seger had not yet recuperated from her recent hospital stay.  Moreover, during that visit with Dr. Caylor, Seger apparently did not complain of lightheadedness, dizziness, near syncopal episodes, palpitations, or any of the symptoms related to dysautonomia.  Instead, Seger complained that "there was something wrong with [her] somewhere and no one could get to the bottom of it," and stated that her bones chronically ached.   Seger also advised Dr. Caylor that she was doing poorly from a depression standpoint.

---

[13] Rec. 535

Similarly, on June 26, 2002, Dr. Caylor noted that Seger had myalgias and sleep disturbances for which she was following up with Dr. Clark.  Furthermore, Dr. Caylor continued that Seger was not able to return to work because of all the different medications she was using and the interventions Dr. Clark was doing. Significantly, Dr. Clark was treating Seger in relation to her fibromyalgia, rather than her dysautonomia.  Thus, it would appear her principal disability at that time related to her fibromyalgia, which was a preexisting condition.  Once again, Dr. Caylor did not mention orthostatic intolerance, dizziness, or any of the symptoms specifically related to Seger's dysautonomia.

Dr. Caylor's notes of August 7, 2002, indicate that Seger had a continued "limited ability to function," but Dr. Caylor stated that this conclusion was derived from Seger's anxiety, depression, sleep disturbance, myalgias and dysautonomia.  In other words, her conclusion that Seger was unable to work derived from a variety of symptoms, not specifically related to dysautonomia, and Dr. Caylor's medical notes fail to indicate what physical limitations related to dysautonomia prevented Seger from working.  Similarly, Dr. Harden's FMLA form simply noted that Seger is unable to perform all of her work duties, but significantly he did not indicate what particular illness or physical limitations caused her disability.   As with most of the medical records dated in 2002 and submitted by Seger in support of her disability claim, Dr. Harden's notes simply include a conclusory statement that Seger is unable to work.

Furthermore, Seger complained of symptoms relating to her dysautonomia, such as dizziness, fatigue, and orthostatic intolerance, beginning as early as January 2002, yet she continued to work for the next five months.  There is no indication in Seger's medical records that her dysautonomia conditions significantly increased around the time that Seger stopped working, and Seger has not explained why her symptoms suddenly rendered her unable to perform the essential duties of her job.  Notably, the Plan defines totally disabled as a *significant change* in the

participant's physical or mental condition due to sickness or accidental injury which has caused the participant to become unable to perform the essential duties of her regular occupation.

In supporting her disability claim, Seger also points to medical records submitted in conjunction with her claims denial appeal.  Specifically, Seger submitted a functional capacity evaluation from Dr. Thompson, which placed restrictions on Seger's activities, including: walking less than one hour; standing less than one hour, and sitting for only 2 to 4 hours in an 8-hour workday.  Further, Dr. Thompson stated that Seger required rest periods every one to two hours until she began to feel better, varying in duration depending on the severity of each particular spell.  Based on these restrictions, Dr. Thompson opined that Seger was disabled from full-time employment.  Dr. Thompson also explained that due to Seger's orthostatic intolerance, sometimes her coordination and often her concentration are impaired when Seger is feeling bad.  Dr. Thompson explained that there is no way to predict when this will happen, but it does affect her functioning.

Indeed, it appears these limitations would prevent Seger from performing the essential duties of her occupation because, as her supervisor explained, Seger's job required her to perform at a rapid pace in order to meet constant deadlines.  Further, although Seger's job as a nurse case manager allowed her to sit down for the majority of her workday, it also involved a significant degree of emotional stress.[14]

Like Dr. Thompson, Dr. Vandeberg also completed a capacity evaluation on June 26, 2003, placing essentially the same restrictions on her as Dr. Thompson, and concluding that she was disabled from full-time employment.  The problem with these functional capacity evaluations, however, is that they were completed well

---

[14] Seger testified that she was required to ascend and descend stairs, and reach above and below her shoulders a significant amount of the time.  However, her supervisor indicated that Seger was never required to ascend and descend stairs, and seldom was required to reach above or below her shoulders.

beyond the benefit elimination period defined in the Plan, and well past the deadline of August 26, 2002, when the Plan required Seger to establish that she was totally disabled from performing the essential duties of her employment.   In denying Seger's appeal, ReliaStar explained that its committee reviewed the portion of the medical records submitted with her appeal that pertained to the period of time prior to her last day of work and through the 180-day elimination period, which were the only documents relevant to determining whether she was eligible for benefits. However, ReliaStar explained that the remainder of the documents were not relevant to the period in which it was attempting to verify disability.  The Plan's plain language supports this committee decision.  While medical records concerning a date after the benefit elimination period are relevant in proving that Seger's disability is continuing, Seger must first establish that she was disabled while she was insured.

Therefore, I find that ReliaStar's determination with respect to Seger's disability due to dysautonomia is also "right".  Thus, under either the de novo standard of review or the heightened arbitrary and capricious standard, this court's inquiry ends and ReliaStar's denial of disability benefits must be upheld.  Further, even if I were to determine that ReliaStar's decision was "wrong", the denial of benefits is not arbitrary and capricious if Seger fails to submit objective evidence of a disability which prevents her from working at her regular occupation.  See e.g., Daniels v. Hartford Life & Accident Ins. Co., 898 F. Supp. 909, 912 (N.D. Ga. 1995). See also, Donato v. Metropolitan Life Ins. Co., 19 F.3d 375, 380 (7th Cir.1994).

III.    **CONCLUSION**

For the foregoing reasons, the Defendant's motion for summary judgment (Doc.   28) is GRANTED. The Clerk is directed to enter judgment in favor of the Defendant and against the Plaintiff.  No costs shall be taxed.

DONE and ORDERED this 14th day of September,  2005.


/s/ *Roger Vinson*
**ROGER VINSON**
**Senior U.S. District Judge**